We will continue argument this afternoon in Case 11-400, Florida v. Department of Health and Human Services. Mr. Clement. Mr. Chief Justice, and may it please the Court, the constitutionality of the Act's massive expansion of Medicaid depends on the answer to two related questions. First, is the expansion coercive? And second, does that coercion matter? Mr. Clement, can I ask you just a matter of clarification? Would you be making the same argument if instead of the federal government picking up 90% of the cost, the federal government picked up 100% of the cost? Justice Kagan, if everything else in the statute remained the same, I would be making the exact same argument. So that really reduces to the question of why is a big gift from the federal government a matter of coercion? In other words, the federal government is here saying we're giving you a boatload of money. There is no matching funds requirement. There are no extraneous conditions attached to it. It's just a boatload of federal money for you to take and spend on poor people's health care. It doesn't sound coercive to me, I have to tell you. Well, Justice Kagan, let me — I mean, I eventually want to make the point where even if you had a stand-alone program that just gave 100% — you know, the 100% boatload, nothing but boatloads might still be a problem. Yes, I mean, you do make that argument in your brief. Just the stand-alone program, a boatload of money, no extraneous conditions, no matching funds, is coercive? It is. But before I make that point, can I simply say that you built into your question the idea that there are no conditions. And, of course, when you first asked it was what about the same program with 100% matching on the newly eligible mandatory individuals, which is how the statute refers to them. And that would have a very big condition. And the very big condition is that the states, in order to get that new money, they would have to agree not only to the new conditions, but the government here is — the Congress is leveraging their entire prior participation in the program. Let me give you a hypothetical, Clement. Sure. Now, suppose I'm an employer, and I see somebody I really like and I want to hire that person. And I say, I'm going to give you $10 million a year to come work for me. And the person says, well, I, you know, I've never been offered anywhere approaching $10 million a year. Of course I'm going to say yes to that. Now, we would both be agreed that that's not coercive, right? Well, I guess I'd want to know where the money came from. And if the money came from — Wow. Wow. I'm offering you $10 million a year to come work for me, and you're saying that this is anything but a great choice? Sure, if I told you, actually, it came from my own bank account. And that's what's really going on here in part. And that's why it's not simply a matter of saying — Mr. Clement, can that possibly be? When a taxpayer pays taxes to the federal government, the person is acting as a citizen of the United States. When a taxpayer pays taxes to New York, a person is acting as a citizen of New York. And New York can no more tell the federal government what to do with the federal government's money than the federal government can tell New York what to do with the monies that New York is collecting. Right. And if New York and the United States figured out a way to tax individuals at greater than 100 percent of their income, then maybe you could just say it's two separate sovereigns, two separate taxes. But we all know that in the real world, that to the extent the federal government continues to increase taxes, that decreases the ability of the states to tax their own citizenry. And it's a real tradeoff. Is there a limit on the federal government's power to tax? Are you suggesting that at a certain point the states would have a claim against the federal government raising their taxes because somehow the states will feel coerced to lower their tax rate? No, Justice Sotomayor, I'm not. What I'm suggesting is that it's not simply the case that you can say, well, it's free money, so we don't even have to ask whether the program's coercive. Now, counsel, what percentage does it become coercive? Meaning, as I look at the figures I've seen from Amici, there are some states for whom the percentage of Medicaid funding to their budget is close to 40 percent, but there are others that are less than 10 percent. And you say across the board this is coercive because no state, even at 10 percent, can give it up. What's the percentage of big gift that the federal government can give because what you're saying to me is for a bankrupt state, there's no gift the federal government could give them ever because it can only give them money without conditions. No matter how poorly the state is run, no matter how much the federal government doesn't want to subsidize abortions or doesn't want to subsidize some other state obligation, the federal government can't give them 100 percent of their needs. And, Justice Sotomayor, I'm really saying the opposite, which is not that every gift is coercive, no matter what the amount, no matter how small. I'm saying essentially the opposite, which is there has to be some limit. There has to be some limit on coercion. And the reason is quite simple, because this Court's entire spending power jurisprudence is premised on the notion that spending power is different and that Congress can do things pursuant to the spending power that it can't do pursuant to its other enumerated powers precisely because the programs are voluntary. And if you relax that assumption that the programs are voluntary and you're saying they're coercion, then you can't have spending power jurisprudence that's different. What makes them coercive is that the state doesn't want to face its voters and say, instead of taking 10, 20, 30, 40 percent of the government's offer of our budget and paying for it ourselves and giving up money for some other function, that's what makes it coercive? The state is unwilling to say that? Maybe I can talk about what makes it coercive by talking about the actual statute at issue here and focusing on what I think are the three hallmarks of this statute that make it uniquely coercive. One of them is the fact that this statute is tied to the decidedly nonvoluntary individual mandate. And that makes this unique, but it makes it significant, I think. I'll continue. I thought you had a question. I'm sorry. The second factor, of course, is the fact that Congress here made a distinct and conscious decision to tie the state's willingness to accept these new funds not just to the new funds, but to their entire participation in the statute, even though the coverage for these newly eligible individuals is segregated from the rest of the program. And this is section 2001A3 to page 23A of the appendix to the blue brief. Isn't that true of every Medicaid increase? That each time — I mean, this started quite many years ago, and Congress has added more people and given more benefits, and every time the condition is if you want the Medicaid program, this is the program. Take it or leave it. No, Justice Ginsburg, this is distinct in two different directions. One is, in some of the prior expansions to the program, but not all, Congress has made covering newly eligible individuals totally voluntary. If the states want to cover the newly eligible individuals, they'll get additional money, but if they don't, they don't risk any of their existing participation programs. The 1972 program was a paradigm of that. It created this 209B option for states to participate. This Court talked about it in the Gray Panthers case. There were other expansions that have taken place, such as the 1984 expansions, where they didn't give states that option. But here's the second dimension in which this is distinct, which is here Congress has created a separate part of the program for the newly eligible mandatory individuals. That's what they call them. And those individuals are treated separately from the rest of the program going forward forever. They are going to be reimbursed at a different rate from everybody who is covered under the preexisting program. Now, in light of that separation by Congress itself of the newly eligible individuals from the rest of the program, it's very hard to understand Congress's decision to say, look, if you don't want to cover these newly eligible individuals, you don't just not get the new money. You don't get any of the money under the new mandatory program. Where does it say that? I'm sorry. Where does it say that? It says that it — well, it — where does it say what, Justice Breyer? Well, you just said — you said Congress said if you don't take the new money to cover the new individuals, you don't get any of the old money that covers the old individuals. That's what I heard you say. Right. And where does it say that? It says it in — there's two places where it says it.  The 2001A3 makes part of my — Where is it in your brief? That's at page 23A. In the blue brief? Blue brief. 23A. Okay. Thank you. And this makes not the point about the funding cutoff. This makes the point just that these newly eligible individuals are really treated separately forevermore. Okay. I want the part about the funding cutoff. Right. And there, Justice Breyer — That site section is what? I don't have that — Well, I have it in front of me. Great. Perfect. Thank you. And I'll tell you what I have. What I have in front of me, what it says. Right. And it's been in the statute since 1965. Exactly. And the site I have is 42 U.S.C., section 1396C. So are we talking about the same thing? If that is the provision that gives the secretary — Yeah. Okay. Here's what it says at the end. It says, the secretary shall notify the state agency — this is if they don't comply — that further payments will not be made to the state or in his discretion, that payments will be limited to categories under or parts of the same plan, not affected by such failure, which it repeats until the secretary is satisfied that he shall limit payments to categories under or parts of the state plan not affected by such failure. So reading that in your favor, I read that to say it's up to the secretary whether, should a state refuse to fund the new people, the secretary will cut off funding for the new people. It is obvious the state doesn't want it. And whether the secretary can go further, I also should think — I could not find one case where the secretary ever did go further, but I also would think that the secretary could not go further, where going further would be an unreasonable thing to do, since government action is governed by the Administrative Procedure Act. Since it's governed by the general principle, it must always be reasonable. So I want to know where this idea came from, that should state X say, I don't want the new money, that the secretary would or could cut off the old money. And, Justice Breyer, here's where it comes from, which is from the very beginning of this litigation. We've pointed out that what's coercive is not the absolute guarantee that the secretary could cut off every penny, but the fact that she could. All right, now let me relieve you of that concern and tell me whether I have. That a basic principle of administrative law, indeed all law, is that the government must act reasonably. And should a secretary cut off more money than the secretary could show was justified by being causally related to the state's refusal to take the new money, you would march into court with your clients and say, Judge, the secretary here is acting unreasonably, and I believe there is implicit in this statute, as there is explicit in the ADA, that any such cutoff decision must be reasonable. Now, does that relieve you of your fear? It doesn't for this reason. I didn't think it would. Well, but here's the reason. Here's the reason, Justice Breyer, it doesn't. One is, I mean, I don't know the opinion to cite for that proposition. Second is, we've been making in this litigation since the very beginning this basic point. The government has had opportunities at every level of this system, and I suppose they'll have an opportunity today to say, Fear not, states, if you don't want to take the new conditions, all you will lose is the new money. I said, because it could be, you know, given the complexity of the act, that there is some money that would be saved in the program if the states take the new money, and if they don't take the new money, there is money that is being spent that wouldn't otherwise be spent. There could be some pile like that. It might be that the secretary could show it was reasonable to take that money away from the states, too. But my point is you have to show reasonableness. Do you agree that the government has to act reasonably? Do we strike down unreasonable statutes? My God. Well, and Justice Scalia, I'm not... The executive has to act reasonably, that's certain, in implementing a statute, but if the statute says in so many words that the secretary can strike the whole funding for the whole program, that's the law, unreasonable or not, isn't it? That's the way I would read the law. And if I could just add one thing just for the discussion is the point that, you know, this is not all hypothetical. I mean, there was a record in the district court, and there's an Exhibit 33 to our motion for summary judgment. It's not in the joint appendix. We can lodge it with the court if you'd like. But it's a letter that's in the record in this litigation, and it's a letter from the secretary to Arizona when Arizona floated the idea that it would like to withdraw from the CHIP program, which is a relatively small part of the whole program. And what Arizona was told by the secretary is that if you withdraw from the CHIP program, you risk losing $7.8 billion, the entirety of your Medicaid participation. So this is not something that we've... To make you feel a little better, I want to pursue this for one more minute. There are cases, and many of which Justice Scalia knows as well, which use the... Holly Hill uses the same word as this statute, in the secretary's discretion. And in those cases, this court has said, that doesn't mean the secretary can do anything that he or she wants, but rather they are limited to what is not arbitrary, capricious, and abuse of discretion in interpreting statutes, in applying those statutes, et cetera. End of my argument. End of my question. Respond as you wish. Well, Justice Breyer, I'm not sure that the court's federalism jurisprudence should force states to depend on how a lower court reads Holly Hill. I think that really, right here, what we know to an absolute certainty is that this statute gives the secretary the right to remove all of the state's funding under these programs. And think about what that is. Justice Clement, do you think that the federal government couldn't, if it chose, Congress say, this system doesn't work? We're just simply going to rehaul it. It's not consistent with what we want to accomplish. We're just going to do away with the system and start a new health care plan of some sort. And states, you can take the new plan, you can leave them. We're going to give out 20 percent less, maybe 20 percent more, depending on what Congress chooses. Can Congress do that? Does it have to continue the old system because that is what the states are relying upon and it's coercive now to give them a new system? Justice Sotomayor, we're not saying we have a vested right to participate in the Medicaid program as it exists now. So if Congress wanted to scrap the current system and have a new one, I'm not going to tell you that there's no possibility of a coercion challenge to it, but I'm not going to say that's all. I want to know how I draw the line. Meaning, I think the usual definition of coercion is I don't have a choice. I'm not sure why it's not a choice for the states. They may not pay for something else. If they don't take Medicaid and they want to keep the same level of coverage, they may have to make cuts in their budget to other services they provide. That's a political choice of whether they choose to do that or not. But when have we defined the rights or limited the right of government not to spend money in the ways that it thinks appropriate? Well, Justice Sotomayor, before, I mean, I'll try to answer that question too, but the first part of the question was, you know, what if Congress just tried to scrap this and start over again with a new program? Here's why this is fundamentally different and why it's fundamentally more coercive. Because Congress is not saying we want to scrap this program. They don't have a single complaint, really, with the way that states are providing services to the visually impaired and the disabled under preexisting Medicaid. And that's why it's particularly questionable why they're saying that if you don't take our new money, subject to the new conditions, we're going to take all of the money you've previously gotten that you've been dependent on for 45 years and you're using right now to serve the visually impaired and the disabled. Mr. Clement, may I ask you a question in another line? You represent, what, 26 states? That's right, Justice Sotomayor. So we're also told that there are other states that like this expansion and they are very glad to have it. The relief that you're seeking is to say the whole expansion is no good, never mind that there are states that say we don't feel coerced, we think this is good. You are saying that because you represent a sizable number of states, you can destroy this whole program even though there may be as many states that want it, that don't feel coerced to say they think this is a good thing. Justice Ginsburg, that's right, but that shouldn't be a terrible concern because if Congress wants to do what it did in 1972 and pass a statute that makes the expansion voluntary, every state that thinks that this is a great deal can sign up. What's telling here, though, is 26 states who think that this is a bad deal for them actually are also saying that they have no choice but to take this because they can't afford to have their entire participation in this 45-year-old program wiped out and they have to go back to square one and figure out how they're going to deal with the visually impaired in their state, the disabled in their state. Mr. Clement, I didn't take the time to figure this out, but maybe you did. Is there any chance that all 26 states opposing it have Republican governors and all of the states supporting it have Democrat governors? Is that possible? There's a correlation, Justice. Let me ask you another thing, Mr. Clement. Most colleges and universities are heavily dependent on the government to fund their research programs and other things. And that's been going on for a long time. And then Title IX passes and a government official comes around and says to the colleges, do you want money for your physics labs and all the other things you get it for? Then you have to create an athletic program for girls. And the recipient says, I am being coerced. There's no way in the world I can give up all the funds to run all these labs that we have. I can't give it up. So I'm being coerced to accept this program that I don't want. Why doesn't your theory, if your theory is any good, why doesn't it work any time someone receives something that's too good to give up? Well, Justice Ginsburg, there's two reasons that might be different. One is, this whole line of coercion only applies, is only relevant, really, when Congress tries to do something through the spending power it couldn't do directly. So if Congress tried to impose Title IX directly, I guess the question for this Court would be whether or not Section 5 of the 14th Amendment allowed Congress to do that. I imagine you might think that it did, and I imagine some of your colleagues might take issue with that, but that's the nature of the question. So one way around that would be, if Congress can do it directly, you don't even have to ask whether there's something special about the spending power. That's how this Court resolved, for example, the Fair case about funding to Congress. I'm trying to understand your coercion theory. I know that there are cases of ours that have said there's a line between pressure and coercion, but we have never had, in the history of this country or the Court, any Federal program struck down because it was so good that it becomes coercive to be in it. Well, Justice Ginsburg, I'm going to just say the second thing about my answer to your prior question, which is I also think that, you know, it may be that spending on certain private universities is something, again, that Congress can do, and it doesn't matter whether it's coercion, but when they're trying to get the States to expand their Medicaid programs, that's something... Medicaid, let's take public colleges. Okay. Then there may be some limits on that. I mean, but, again, I'm not sure even in that context there might not be some things Congress can do. It's a separate question. But once we take the premise, which I don't think there's a disagreement here, that Congress could not simply, as a matter of direct legislation under the Commerce power or something, say, States, you must expand your Medicaid programs. If we take that as a given, then I think we have to ask the question of whether or not it's coercive. Now, in your second question, you asked, well, you know, I mean, where's the case that says that we've crossed that line? And this is that case, I would respectfully... And it doesn't even apply as well to the 1980 extension to children 0 to 6 years old, 1990 requiring the extension for children up to 18. All those prior extensions to me seem just as big in amount, just about as big in the number of people coming on the rolls, and they all are governed by precisely the same statute that you're complaining of here, which has been in the laws since 1965. Justice Breyer, I don't think that our position here would necessarily extend to, say, the 1984 amendments, and let me tell you why. You know, I'm not saying that absolutely that's guaranteed that's not coercive, but here's reasons why they're different. The one major difference is the size of the program. I mean, the expansion of Medicaid since 1984 is really breathtaking. Medicaid circa 1984, the federal spending to the states was a shade over $21 billion. Right now it's $250 billion, and that's before the expansion under this statute. Well, if you are right, Mr. Clements, doesn't that mean that Medicaid is unconstitutional now? Not necessarily, Justice Kagan, and again, it's because we're not here with a one-trick pony. One of the factors, we point you to three factors that make this statute uniquely coercive. One of them is the sheer size of this program. And, you know, if you want to gauge on the size of this program, the best place to look is the government's own number. Footnote 6, page 7 of your brief. So when does the program become too big? Give me a dollar number. $3.3 trillion over the next 10 years. I'll give you this number, which I did look up, that the amount approximately, if you look into it, as a percentage of GDP, it's big. But it was before this somewhere about 2-point-something percent fairly low of GDP. It'll go up to something a little bit over 3% of GDP. And now go look at the comparable numbers, which I did look at, with the expansion that we're talking about before, the expansion from 0 to 18 or even from 0 to 6. And while you can argue those numbers, it's pretty hard to argue that they aren't roughly comparable as a percentage of the prior program or as a percentage of GDP. If I'm right on those numbers, or even roughly right, I don't guarantee them, then we do have to say, well, indeed, Medicaid has been unconstitutional since 1964. And if not, why not? The answer is no, and that's because we're here saying there are three things that make this statute uniquely... What are your second and third? I'm on pins and needles to hear your... Yeah, exactly. Well, one is the sheer size. Two is the fact that this statute uniquely is tied to an individual mandate, which is decidedly non-voluntary. And three is the fact that they've leveraged the prior participation in the program, notwithstanding that they've broken this out as a separately segregated fund going forward, which is not true. So on the third, suppose you have the current program, and Congress wakes up tomorrow and says, we think that there's too much fraud and abuse in the program, and we're going to put some new conditions on how the states use this money so we can prevent fraud and abuse, and we're going to tie it to everything that's been there initially. Unconstitutional? No, I think that is constitutional, because I think that's something that Congress could do directly. It wouldn't have to limit that to the spending program. I think 18 U.S.C. 666 is a statute. You know, it's in the criminal code. It may be tied to spending, but I think that's a provision that I don't think is constitutionally called into question. I guess I don't get the idea. I mean, Congress can legislate fraud and abuse restrictions in Medicaid, and Congress can legislate coverage expansions in Medicaid. Well, Justice Kagan, I think there's a difference. But if I'm wrong about that, and the consequence is that Congress has to break Medicaid down into remotely manageable pieces as opposed to $3.3 trillion over 10 years before the expansion, I don't think that would be the end of the world. But I really would ask you to focus on specifically what's going on here, which is they take these newly eligible people, and that's a massive change in the way the program works. These are people who are healthy, childless adults who are not covered in many states. They say, okay, we're going to make you cover those. We're going to have a separate program for how you get reimbursed for that. You get reimbursed differently from all the previously eligible individuals. But if you don't take our money, we're going to take away your participation in the program for the visually impaired and the disabled. If I reserve the balance of my time. Well, I'm not sure my colleagues have exhausted their questions. My greatest fear, Mr. Clement, with your argument is the following. The bigger the problem, the more resources it needs. We're going to tie the hands of the federal government in choosing how to structure a cooperative relationship with the states. We're going to say to the federal government, the bigger the problem, the less your powers are. Because once you give that much money, you can't structure the program the way you want. To our money, federal government, we're going to have to run the program ourselves to protect all our interests. I don't see where to draw that line. The uninsured are a problem for states only because they too politically, just like the federal government, can't let the poor die. And so to the extent they don't want to do that, it's because they feel accountable to their citizenry. And so if they want to do it their way, they have to spend money to do it their way. If they don't want to do it the federal way. So I just don't understand the logic of saying states, you're not entitled to our money, but once you start taking it, the more you take, the more power you have. Well, Justice Sotomayor, a couple of points. One is I actually think that sort of misdescribes what happened with Medicaid. I mean, states were, as you suggest, providing for the poor and the visually impaired and the disabled even before Medicaid came along. Then all of a sudden, the federal government says, look, we'd like to help you with that, and we're going to give you money voluntarily. And then over time, they give more money with more conditions, and now they decide they're going to totally expand the program and they say that you have to give up even your prior program where we first came in and offered you cooperation. We're now going to say you have to give that up if you don't take our new conditions. Secondarily, I do think that our principle is not that when you get past a certain level, it automatically becomes coercive per se, but I do think when you get a program and you're basically telling states that, look, we're going to take away $3.3 trillion over the next 10 years, that at that point, it's okay to insist that Congress be a little more careful that it not be so aggressively coercive as it was in this statute. And I would simply say that we're not here to tell you that this is going to be an area where it's going to be very easy to draw the line. We're just telling you that it's exceptionally important to draw that line, and this is a case where it ought to be easy to establish a beachhead, say that coercion matters, say there's three factors of this particular statute that make it as obviously coercive as any piece of legislation that you've ever seen, and then you will have effectively instructed Congress that there are limits and you have laid down some administrable rules. Mr. Clement, the chief has said, I can ask this. He doesn't always check. As I recall your theory, it is that to determine whether something is coercive, you look to only one side, how much you're threatened with losing or offered to receive, and the other side doesn't matter. I don't think that's realistic. I think the old Jack Benny thing, your money or your life, and he says, I'm thinking, I'm thinking. It's funny because it's no choice. Your life, again, it's just money. It's an easy choice, no coercion. Right? Now, whereas if the choice were your life or your wife's, that's a lot harder. Now, is it coercive in both situations? Well, yes, it is. Really? It's a tough choice. I thought you were going to say the statute is your money and your life. It is, but I mean, I might have missed something, but both of those things could be. No, no, no. When you say you're coerced, it means you've been given an offer you can't refuse. Okay? You can't refuse your money or your life. But your life or your wife's? I could refuse that one. Let's leave the wife out. Mr. Clemente, he's not going home tonight. Let's leave the wife out. I was going to say, Mr. Clemente. No, I'm talking about my life. I say, take mine, you know. I wouldn't do that either. I'm going to use that example. Forget about it. That's enough frivolity for a while. But I want to make sure I understand where the meaningfulness of the choice is taken away. Is it the amount that's being offered, that it's just so much money, of course you can't turn it down? Or is it the amount that's going to be taken away if you don't take what they're offering? It's both, Your Honor. And I think that that's, I mean, there really is three strings in this bow. I mean, one is the sheer amount of money here makes it very, very difficult to refuse. Because it's not money that has come from some, you know, China or from the export tariffs like in the old days. It's come from the taxpayers. So that's part of it. The fact that they're being asked to give up their continuing participation in a program that they've been participating in for 45 years as a condition to accept the new program, we think that's the second thing that's going on. But isn't that a consequence of how willing they have been since the New Deal to take the federal government's money? And it seems to me that they have compromised their status as independent sovereigns because they are so dependent on what the federal government has done. They should not be surprised that the federal government, having attached this, they tied the strings. They shouldn't be surprised that the federal government isn't going to start pulling them. With all due respect, Mr. Chief Justice, I don't think we can say that, you know, the states have gotten pretty dependent, so let's call this whole federalism thing off. And I just think it's too important because, again, the consequence, if you think about it, if the consequence of saying that we're not going to police the coercion line here shouldn't be that, well, you know, it's just too hard, so we'll give the federal Congress unlimited spending power. The consequence ought to be if you really can't police this line, then you should go back and reconsider your cases and say that Congress can spend money on things that it can't do directly. And we're not asking you to go that far. We're simply saying that, look, your spending power cases absolutely depend on there being a line between coercion and voluntary action. I don't understand your first answer to Justice Kagan. You don't see there being a difference between the federal government saying we want to take care of the poor, states, if you do this, we'll pay 100 percent of your administrative costs, and you said that could be coercion. All right? Doesn't the amount of burden that the state undertakes to meet the federal obligation count in this equation at all? It certainly can, Justice Sotomayor. I didn't mean to suggest in answering Justice Kagan's question that my case was no better than that hypothetical. I mean, but it's in the nature of things that I do think the amount of the money, even considered a loan, does make a difference, and it's precisely because it has an effect on their ability to raise revenue from their own citizens. So it's not just free money that they're turning down if they want to. If we go back to that era of matching what a state pays to what a state gets, Florida loses. Its citizens pay out much less than what they get back in federal subsidies of all kinds. So you can't really be making the argument that Florida can't ask for more than it gives because it's really giving less than it receives. I don't really want to go back to that point, do you? Well, then I'll make that argument on behalf of Texas. But it's not what my argument depends on, and that's the critical thing. It's one aspect of what makes this statute uniquely coercive. And I really think if you ask the question, what explains the idea that if you don't take this new money, you're going to lose all your money under what you've been doing for 45 years to help out the visually impaired and the disabled? Nobody in Congress wants the states to stop doing that. They're just doing it, and it's purely coercive to condition the money. It's leverage, pure and simple. If the inevitable consequence of your position was that the federal government could just do this on its own, the federal government could have Medicaid, Medicare, and these insurance regulations, assume that's true. Then how are the interests of federalism concerned? How are the interests of federalism concerned if in Florida or Texas or some of the other objecting states there are huge federal bureaucracies doing what this bill allows the state bureaucracies to do? I know you've thought about that. I'd just like your answer. I have, and I'd like to elaborate, but the one-word answer is accountability. If the federal government decides to spend money through federal instrumentalities and the citizen is hacked off about it, they can bring a federal complaint to a federal official working in a federal agency. And what makes this so pernicious is that the federal government knows that the citizenry is not going to take lightly the idea that there are huge new federal bureaucracies popping up across the country. And so they get the benefit of administering this program through state officials, but then it makes it very confusing for the citizen who doesn't like this. Do they complain to the state official because it's being administered by a state official in a state building? That is very confusing because the idea behind cooperative federal state programs was exactly a federalism idea. It was to give the states the ability to administer those programs. It was to give the states a great deal of flexibility in running those programs, and that's exactly what Medicaid is. Well, that's exactly what Medicaid was. The question is, what will it be going forward? And I absolutely take your point, Justice Kagan. Cooperative federalism is a beautiful thing. Mandatory federalism has very little to recommend it because it poses exactly the kind of counter- Cooperative federalism does not mean that there are no federal mandates and no federal restrictions involved in a program that uses 90 percent here, 100 percent federal money. It means there's flexibility built into the program subject to certain rules that the federal government has about how it wishes its money to be used. It's like giving a gift certificate. If I give you a gift certificate for one store, you can't use it for other stores, but still you can use it for all kinds of different things. But I absolutely agree that if it's cooperative federalism and the states have choices, then that is perfectly okay. But that's why voluntariness and coercion is so important, because if you force a state to participate in a federal program, then, I mean, as long as it's voluntary, then the state officials shouldn't complain if a citizen complains to the state about the way the state's administering a federal program that it volunteered to participate in. But at the point it becomes coercive, then it's not fair to tell the citizen to complain to the state official. They had no choice. But who do they complain to at the federal level? There's nobody there, which would be – I'm not saying it's the best solution to have federal instrumentalities in every state, but it actually is better than what you get when you have mandatory federalism and you lose the accountability that's central to the federalism provisions in the Constitution. Thank you, Mr. Clement. General Verrilli? Mr. Chief Justice, and may it please the Court, the Affordable Care Act's Medicaid expansion provisions will provide millions of Americans with the opportunity to have access to essential health care that they cannot now afford. It is an exercise of the Spending Clause power that complies with all of the limits set forth in this Court's decision in Dole, and the states do not contend otherwise. The states are asking this Court to do something unprecedented, which is to declare this an impermissibly coercive exercise. What do you think we meant in those dicta in several prior cases where we've said that the federal government cannot be coercive through the Spending Clause? What do you think we were – give us a hypothetical. Yeah. First, if I could, just try to be a little more precise about it, Justice Scalia. I think what the Court said in Steward and Machine and in Dole is that it's possible that you might envision a situation in which there's coercion. Okay. The Court didn't say much more, but I can think of something. One example I could think of that might serve as a limit would be a COIL-type situation in which the condition attached worked a fundamental transformation in the structure of state government in a situation in which the state didn't have a choice but to accept it. But anything else, so long as the – you're talking about a situation where they have to locate their statehouse in some other city. But short of that, they can make the state do anything at all. Well, no. The Dole conditions are real. The germane-ness condition in Dole is real, for example. And so those – But none of those have addressed the coercion question. Right. So do you think it would be all right for the federal government to say – same program – states, you can take this or you can leave it. But if you don't take it, you lose every last dollar of federal funding for every program. I think that would raise a germane-ness issue, Mr. Chief Justice, but it's not what we – There's no coercion question at all. Well, but I think they're related. I think that the germane-ness inquiry in Dole really gets at coercion in some circumstances, and that's why I think they're related. But we don't have that here. And if I could, I would like to – No, I know we don't have that here. How does germane-ness get to – what were the words? Because it gets to be harder to see – That's germane-ness. There's no – What the connection is between getting you to do A and the money – So it fails because it's not germane, but you're saying it would not fail because it was coercive. Well, I think that, as I said, I think they're really trying to get at the same thing, but I do think it's quite different here, and I would like to, if I could, take up – No, no, I know it's different here. I'm just trying to understand if you accept the fact, or regard it as true, that there is a coercion limit, or that once the Federal Government – once you're taking Federal Government money, the Federal Government money can take it back, and that doesn't affect the voluntariness of your choice. Because it does seem like a serious problem. We're assuming, under the Spending Clause, the Federal Government cannot do this. Under the Constitution, it cannot do this. But if it gets the State to agree to it, well, then it can. And the concern is, if you can say, if you don't agree to this, you lose all your money, whether that's really saying the limitation in the Constitution is largely meaningless. Well, but I don't think that this is a case that presents that question. No, no, I know. I know this stuff. I won't know if I'll grant it to you or not, but let's assume it's not this case. Do you recognize any limitation on that concern? We're – I think the Court has said in Steward, Machine, and Dole that this is something that needs to be considered in an appropriate case, and we acknowledge that. But I do think it's so dependent on the circumstances that it's very hard to say in the abstract, with respect to a particular program, that there isn't. You can't imagine a case in which it is both germane and yet coercive, is what you're saying. There's no such case, as far as you know. Well, I'm not prepared to say right here that I can – I wouldn't think that's a surprise question. I mean, I – you know. But I think Congress has authority to act. I can't think of one. I'm not blaming you for not thinking of one. But I do think – but I do think – I really do think that it's important to look at this. An issue like this, if you're going to consider it, has got to be considered in the factual context. Let me give you the factual context. Let's say Congress says this to the States. We've got great news for you. We know that your expenditures on education are a huge financial burden. So we're going to take that completely off your shoulders. We're going to impose a special federal education tax, which will raise exactly the same amount of money as all of the states now spend on education. And then we're going to give you a grant that is equal to what you spent on education last year. Now, this is a great offer, and we think you'll take it. But, of course, if you take it, it's going to have some conditions, because we're going to set rules on teacher tenure, on collective bargaining, on curriculum, on textbooks, class size, school calendar, and many other things. So take it or leave it. If you take it, you have to follow our rules on all of these things. If you leave it, well, then you're going to have to tax your citizens. They're going to have to pay the federal education tax. But on top of that, you're going to have to tax them for all of the money that you're now spending on education, plus all of the federal funds that you were previously given. Would that be the point where financial inducement turns into coercion? No, I don't think so, because the states do have a choice there, especially as a going-in proposition. I mean, the argument the states are making here is not that this is not a going-in proposition. Their argument is that they are in a position where they don't have a choice because of everything that's happened before. You might be right, but if that's the case, then there's nothing left of federalism. Well, but as a practical matter, I disagree with that, Justice Alito. First of all, as a practical matter, there's a pretty serious political constraint on that situation ever arising, because it's not like the Federal Government is going to have an easy time of raising the kinds of tax revenues that need to be raised to work that kind of fundamental transformation. And that's real, and political constraints do operate to protect federalism in this area. I would have thought there was a serious political constraint on the individual mandate, too. But that didn't work. What you call serious political constraints sometimes don't work. But with respect to a situation like that one, Justice Scalia, the states have their education system, and they can decide whether they're going to go in or not. But here, of course, I think it's important to trace through the history of Medicaid. It is not the case, as my friend from the other side suggested, that the norm here is that the Federal Government has offered to the states the opportunity either to stay where they are or add the new piece. We can debate that proposition with respect to 1972 one way or another. The states have one view about that. We have a different one. But starting in the 1984 expansion, with respect to pregnant women and infants, it was an expansion of the entire program. States were given the choice to stay in the entire program or not. 1989, when the program was expanded to children under 6 years of age, under 133 percent of poverty, same thing. 1990, kids 6 to 18 and 100 percent of poverty, same thing. In fact, every major expansion, same thing. And so I just think the history of the program, and particularly when you read that in context of 42 U.S.C. 1304, which reserves the right of the Federal Government to amend the program going forward, shows you that this is something that the states have understood all along. This has been the evolution of it. And with respect to- Could you give me some assurance? We heard the question about whether or not the Secretary would use this authority to the extent available. Is there circumstances where you are willing to say that that would not be permissible? I'm thinking, well, the Arizona letter, for example. I mean, if I had the authority and I was in that position, I would use it all the time. You want some little change made? Well, guess what? I can take away all your money if you don't make it. I win. Every time, it seems that that would be the case. So why shouldn't we be concerned about the extent of authority that the government is exercising, simply because they could do something less? We have to analyze the case on the assumption that that power will be exercised, don't we? Well, Mr. Chief Justice, it would not be responsible of me to stand here in advance of any particular situation coming before the Secretary of Health and Human Services and commit to how that would be resolved one way or another. I appreciate that. The direction is there in the statute, and I think there's every reason to think it's real. But I do think, getting back to the circumstances here. Well, General, what's been the history of its use? Has the Secretary, in fact, ever made use of that authority? That's correct, Justice Kagan. It's never been used. What about the Arizona letter we just heard about today? It has never been used to cut off. It's been used to threaten. Of course no state's going to say, okay, go ahead, make my day, take it away. They're going to give in. If we're going to go to the situation we have here, Mr. Chief Justice, with respect to the Medicaid expansion, the state's argument is, as they said in their briefs, they articulated it a little bit different this morning, this afternoon, but as they said it in their briefs, it's not what you stand to gain but what you stand to lose. But I think an important thing in evaluating that argument in this context is fully 60 percent of Medicaid expenditures in this country are based on optional choices. And I don't mean by that the optional choices of the states to stay in the program in 84, 88, or 89. But states are given choices to expand the beneficiaries beyond the federal minimum and to expand services beyond the federal minimum. Just a small point, and please correct me if I'm wrong. Does this act not require states to keep at the present level their existing Medicaid expansion? So some states may have been more generous than others in Medicaid, but this act freezes that so the states can't go back. Or am I incorrect? It's much more nuanced than that, Justice Kennedy. There is something called a maintenance of effort provision which lasts until 2014, until such time as the Medicaid expansion takes place and the exchanges are in place. That applies to the population. It says with respect to the population you can't take anybody out. It does not apply to the optional benefits where the states still have flexibility. They can still reduce optional benefits if they're now providing, if they want to, to control costs. They can also work on provider rates. There's also with respect to demonstration projects by which some states have expanded their populations beyond the required eligibility levels. They don't have to keep them in. And then there's also the state has a budgetary crisis. It can get a waiver of that, as Wisconsin did. So that is a provision I think that does a significant degree less than my friends on the other side have suggested in terms of its effect. And its effect beyond that is just temporary. But I do think with respect to the first of their three arguments for coercion, the sheer size argument, that it's very difficult to see how that is going to work because if the question is about what you stand to lose rather than what you stand to gain, then it seems to me that it doesn't matter whether the Medicaid expansion is substantial or whether it's modest or whether there's any expansion at all. The states, for example, the federal government, for example, could decide that under the current system, too much money has ended up flowing to nursing home care. And that money would be better in serving the general welfare if it were directed at infants and children. But if the federal government said we're going to redirect the spending priorities of the federal money that we're offering to you, the states could say, well, geez, we don't like that. We'd like to keep spending the money the way we were. And we have no choice because this program has gotten too big for us to exit. And in fact, it seems to me standing here today before these expansions take place under their theory, the provisions of the principle. The smaller it is, the bigger the coercion. Right. The smaller what you're demanding of them, the bigger the coercion to go along. The more they stand to lose. I'm sorry. Just before you leave that, I'd appreciate it if you would expand a little bit on the answer to Justice Kagan's question. For the reason when I read the cutoff statute, which, as I said, has been there since 1965 unchanged, it does refer to the secretary's discretion to keep the funding insofar as the funding has no relationship to the failure to comply with the condition. And as I read that, that gives the secretary the authority to cut off all the money. But the state's refusal to accept the condition means they shouldn't have. But nothing there says they can go beyond that and cut off unrelated money. Now, there is a sentence that says maybe they could do that. But I thought they had to exercise that within reason, when it would be reasonable. So you've looked into it. And that's what I want to know. I could find no instance where they went beyond the funds that were related to the thing that the state refused to do or things affected by that. I would like you to tell me, when you look into it, that what I thought of in this isolation chamber here is actually true. Or whether they have gone around threatening people that we will cut off totally unrelated funds. What is the situation? So I think the situation is generally as you described it. But I do want to be careful in saying I don't think it would be responsible of me to commit now that the secretary would exercise the discretion uniformly in one way or another. Well, that's just saying that when, you know, the analogy that's been used, the gun to your head, your money or your life, you say, well, there's no evidence that anyone's ever been shot. Well, it's because you have to give up your wallet. You don't have a choice. And you cannot, you cannot represent that the secretary has never said, and if you don't do it, we're going to take away all the funds. They cite the Arizona example. I suspect there are others, because that is the leverage. I'm not saying there's anything wrong with it. It's not coercion, Mr. Chief Justice. Wait a second. It's not coercion. Well, I guess that's what the case is. It's not coercion to say I'm going to take away all your funds, no matter how minor the infringement. I don't know if that's so. And all I asked in my question was I didn't ask you to commit the secretary to anything. I wanted to know what the facts are. I wanted to know what you found in researching this case. I wanted you to, in other words, answer the question the Chief Justice has. Is it a common thing that that happens, that this unrelated threat is made, or isn't it? My understanding is that these situations are usually worked out back and forth between the states and the federal government. And I think you're not privy to that. And I'm not. And who wins? That's what I think is the problem here, Justice Scalia. It seems to me we're operating under a conception that isn't right. The reason that we've had all these Medicaid expansions, and the reason, it seems to me, why we are where we are now, and why 60 percent of what's being spent on Medicaid is based on voluntary decisions by the states to expand beyond what federal law requires, is because this is a good program, and it works, and the states generally like what it accomplishes. Is this discussion realistic? The objective of the Affordable Care Act is to provide near universal health care. Now, suppose that all of the 26 states that are parties to this case were to say, well, we're not going to abide by the new conditions. Then there would be a huge portion, a big portion of the population that would not have health care. And it's a realistic possibility that the Secretary is going to say, well, okay, fine. You know, we're going to cut off your new funds, but we're not going to cut off your old funds and just let that condition sit there? Well, Justice, I can't make a commitment that the authority wouldn't be exercised. I'm not going to make a commitment that it would be exercised. But I do think that that — trying to move away from the first of their arguments, the sheer size argument, to the second one, which is that it's coercive by virtue of its relationship to the Affordable Care Act, I really think that that's a misconception. And I'd like to be able to take a minute and walk through and explain why that is. And really, before you do that, I'm sorry, but in response to the Chief Justice's question, I mean, the money of your life has consequence because we're worried that that person is actually going to shoot. So I think that this question about what do we think the Secretary is going to do is an important one. And as I understand it, I mean, when the Secretary withdraws funds, what the Secretary is doing is withdrawing funds from poor people's health care, and that the Secretary is reluctant and loath to take money away from poor people's health care, and that that's why these things are always worked out. It's that the Secretary really doesn't want to use this power, and so the Secretary sits down with the state and figures out a way for the Secretary not to use the power. That's correct, Justice Kagan. No, what the — I'm sorry. Go ahead. That's another way of trying to say what I was trying to say to Justice Scalia earlier, is that the states and the federal government share a common objective here, which is to get health care to the needy. And in the vast majority of instances, they work together to make that happen. Yeah, but the question is not, obviously the states are interested in the same objective, and they have a disagreement, or they have budget realities that they have to deal with. And states say, well, we're going to cut by 10 percent what we reimburse this for or that for, and the federal government says, well, you can't. No one's suggesting that people want to cut health care, but they have different views about how to implement a policy in this area. And the concern is that the Secretary has the total and complete say, because the Secretary has the authority under this provision to say, you lose everything. No one suggests that in the normal course that will happen. But so long as the federal government has that power, it seems to be a significant intrusion on the sovereign interest of the state. Now, I'm not, it may be something they gave up many decades ago when they decided to live off federal funds, but I don't think you can deny that it's a significant authority that we're giving the federal government to say, you can take away everything if the states don't buy into the next program. Well, but what I would say about that, Mr. Chief Justice, is that we recognize that these decisions aren't going to be easy decisions in some circumstances. It's a practical matter. There may be circumstances in which they're very difficult decisions, but that's different from saying that they're coercive and different from saying that it's an unconstitutional coercive exercise. Why is it different? I mean, I thought it might be very unlikely a state would ever say, or the federal government would say, here's a condition that you have to have a certain kind of eyeglasses for people who don't see. And by the way, if you don't do that, we'll take away $42 billion of funding. Okay. I thought such a thing would not happen. And I thought if it tried to happen, that it's governed by the APA, and the person with the eyeglasses would say it's arbitrary, capricious, abusive discretion. And that's so even though the statute says it's in the discretion of the Secretary. But your colleague and brother says, no, I'm wrong about the law there. And moreover, they would do it. That's what I'm hearing now. They would do it, and they do do it, and et cetera. So I'd like a little clarification. In the situation described in your hypothetical, Justice Breyer, I think the Secretary of Health and Human Services would never do it. But what I'm saying is with respect to the Medicaid expansion in this case. Would never do it? Would never do it. Well, and I think it would have to satisfy the Administrative Procedure Act, and that's a real constraint. What I don't feel able to do here is to say with respect to this Medicaid expansion. Are you willing to acknowledge that the Administrative Procedure Act is a limitation on the Secretary's ability to cut off all the funds? She can't do it if that would be unreasonable. Are you willing to accept that? I wouldn't if I were you. So what I'm trying to do here is to suggest that the Secretary does have discretion under the statute. Indeed, part of the discretion is to cut off all of the funds. That's what the statute says. And it is possible, and I'm not willing to give that away. But, General Verrilli, you're not willing to give away whether the APA would bar that. But the APA surely has to apply it to a discretionary act of the Secretary. I agree with that, Justice Kagan. What's making you reluctant? I'm not trying to be reluctant. I understand how this works. I'm trying to be careful about the authority of the Secretary of Health and Human Services and how it will apply in the future. I wouldn't mind if I were you. I don't know of any case where the Secretary's discretion explicitly includes a certain act. We have held it nevertheless. That act cannot be performed unless we think it reasonable. I don't know any case like that. Yes, when there's just a general grant of discretion, it has to be exercised reasonably. But maybe Justice Breyer knows such a case. All right, give it to him. If I could go back to this sheer size idea, I think another couple of points are important in thinking about whether that's a principle courts could ever apply. Once you get into that business, in addition to the problem I identified earlier that it basically means that Congress is frozen in place now, based on the size of the program, you've got this additional issue of having to make a judgment about in what circumstances will the loss of the federal funding be so significant that you would counter this? I suppose one test could be, I just don't see that it would be very workable, is whether or not it's so big that accountability is lost, that it is not clear to the citizens that the state or the federal government is administering the program, even though it's a state administrator. This is going to come from a withdrawal situation. There are arguments about it's what you stand to lose. I mean, so does it depend on, is it an absolute or relative number with respect to how much of the state budget? Is it a situation where you have to make a calculation about how hard would it be for that state to make up in state tax revenues the federal revenue they would lose? Does that depend on whether it's a high-tax state or a low-tax state? It just seems to me, and then what's the political climate in that state? In your view, does federalism require that there be a relatively clear line of accountability for political acts? Yes, of course it does, Justice Kennedy. Is that assumed in the coercion test or is that an indication? Here, the coercion test, as it's been discussed, I think, for example, in Justice O'Connor's dissent in Dole and some of the literature, does address federalism concerns in the sense of the federal government using federal funding in one area to try to get states to act in an area where the federal government may not have Article I authority. But as Your Honor suggested earlier, this is a situation in which while it is certainly true that the federal government couldn't require the states, as the Chief Justice indicated, to carry out this program, the federal government could, as Your Honor suggested, expand Medicare and do it itself. Do you agree that there still is inherent, implicit in the idea of federalism, necessary for the idea of federalism, that there be a clear line of accountability so the citizen knows that it's the federal or the state government who should be held responsible for a program? Certainly, but I think the problem here is... And does coercion relate to that or is that a separate thought? Well, I think it relates to it in the opposite way that my friends on the other side would like it to, in that I think their argument is that it would subject us to such a high degree of political accountability at the state level to withdraw ourselves from the program that it's an unpalatable choice for us, and that's where the coercive effect comes from, and that's why I think... Well, but I think the answer would be that the state wants to preserve its integrity, its identity, its responsibility in the federal system. And of course it may do so. May it do so. Doesn't the question come down to this? Maybe you can answer this yes, but isn't the question simply, is it conceivable to you, as it was evidently not to Congress, that any state would turn down this offer that they can't refuse? Is it conceivable to you that any state would have said no to this program? Congress didn't think that because some of its other provisions are based on the assumption that every single state will be in this thing. Can you conceive of a state saying no? And if you can't, that sounds like coercion. I think Congress predicted that states would stay in this program, but that prediction is not coercion. And the reason Congress predicted it, I think, Justice Scalia, is because the federal government is paying 90-plus percent of the cost. It increases state costs by 81 percent. But what do you predict? If you predict the same, that 100 percent of the states will accept it, that sounds like coercion. Prediction is not coercion. I disagree, Justice Scalia. That's just an assumption. And if it proves to be wrong, then Congress has time to recalibrate. And beyond that, I do think, if I just want to go back to the other part of Your Honor's point, that with respect to the relationship between Medicaid and the Act, and particularly the minimum coverage provision, my friend, Mr. Coleman, has suggested that you can infer coercion because with respect to the population to which the provision applies, if there's no Medicaid, there's no other way for them to satisfy the requirement. I want to work through that for a minute, if I may, because it's just incorrect. First of all, with respect to anybody at 100 percent of the poverty line or above, there is an alternative in the statute. It's the exchanges with tax credits and with subsidies to insurance companies. So with respect to that part of the population, 100 percent of poverty to 133 percent of poverty, the statute actually has an alternative for them. For people below 100 percent of poverty, it is true that there is no insurance alternative, but by the same token, there is no penalty that is going to be imposed on anybody in that group. To begin with, right now, the level of 100 percent of poverty is $10,800. The requirement for filing a federal income tax return is $9,500. So anybody below $9,500, no penalty because they don't have to file an income tax return. The sliver of people between $9,500 and $10,800, the question there is are they going to be able to find health insurance that will cost them less than 8 percent of their income? I'm following this argument. Take the poorest of the poor. If there is no Medicaid program, then they're not going to get health care. Isn't that right? Yes, that's true. And so Congress obviously assumed, it thought it was inconceivable that any state would reject this offer because the objective of the Affordable Care Act is to provide near universal care, and Medicaid is the way to provide care for at least the poorest of the poor. So it just didn't occur to them that this was a possibility. When that's the case, how can that not be coercion? Unless it's just a gift. Unless it's just purely a gift. And it comes back to the question of whether you think it makes a difference that the money, a lot of the money to pay for this is going to come out of the same taxpayers that the states have to tax their money. These are Federal dollars that Congress has offered to the states and said we're going to make this offer to you, but here's how these dollars need to be spent. This is the essence of Congress's Article I authority under the General Welfare Clause and the Appropriations Clause. This is not some remote contingency, an effort to leverage in that regard. This is how Congress is going to have the Federal government's money be used if states choose to accept it. Yes, it was reasonable for Congress to predict in this circumstance that the states were going to take this money because it is an extremely generous offer of funds, 90 plus percent of the funding. States can expand their Medicaid coverage to more than 20 percent of their population for an increase of only 1 percent. If it's such a good deal, why do you care? If it's such a good deal, why do you need the club? It's a good deal. Take it. If you don't take it, you're just hurting yourself. That's a judgment for Congress to make about how Federal funds are going to be used if states choose to accept them, and Congress has made that judgment. That's Congress's judgment to make, and it doesn't mean that it's coercive. You have another 15 minutes. The point is there's no realistic choice. There's no real choice, and Congress does not, in effect, allow for an opt-out. We just know that, and it's substantial. I would go back to the fact that 60 percent of the Medicaid spending is now optional. It's a result of choices that states have made that it's expanded. Even though those are now frozen in, per our earlier discussion, to a large extent. Well, no, to a much more modest extent was my point, Justice Kennedy. For example, optional services, where a huge amount of money is spent, more than $100 billion annually, the largest component of that is nursing home services. That remains optional. Right now, once the maintenance of effort provision remains in place, states have the flexibility to reduce those numbers. States have considerable flexibility now and going forward with respect to the way that money is spent, and I do think in terms of evaluating whether this expansion should be considered coercive, it's got to be evaluated against the backdrop of the fact that the states are generally taking advantage of the opportunities of this statute to greatly expand the amount of money that the Federal Government spends and the amount of money that they spend to try to make the lives of their citizens better. I think it's very important. Of course, they have to do so by hiring a substantial number of more employees. There will be state employees. There will be substantial state administrative expenses that are not reimbursed. Well, but I would take issue with that, Justice Kennedy. Part of the Affordable Care Act is that it provides for new streamlined eligibility processes to get people into the system at a much faster and cheaper rate. There are going to be costs to set that up, but under the statute, the Federal Government is going to pay 90 percent of those costs, the short-term setup costs, and then all of the projections that we have seen suggest that the medium- term costs, once these changes are in place, are going to be dramatically lower for the sluts on the administrative side. Obviously, the Federal Government isn't bound to that. And what if after the 90 percent, they say, well, from now on, we're going to pay 70 percent? What happens then? Where does that extra money come from? Well, I think then the states would have a choice at that point whether they were going to stay in the program or not. But that isn't what we have here. And there's no — they can just bail out whenever the government reduces the amount of the percentage that it's willing to pay. The states can say that's — I'm not saying it would be an easy choice, Mr. Chief Justice. They'd have to bail out of Medicaid. The states would have to — Not just give. That would be — Oh, right. That would be the option. They can leave Medicaid if they decide that that isn't working for them. I'm saying — I'm not saying this is an easy choice. I'm also not saying it would happen, because the Secretary does have this discretion. Well, the Secretary has the discretion. We're talking about something else. We're talking about fiscal realities and whether or not the Federal Government is going to say we need to lower our contribution to Medicaid and leave it up to the states, because we want people to be mad at the states when they have to have all these budget cuts to keep it up and not at the Federal Government. But that would be true, Mr. Chief Justice, whether this Medicaid expansion occurred or not. I know. But you've been emphasizing that the Federal Government is going to pay 90 percent of this, 90 percent of this. And it's not something you can take to the bank, because the next day or the next fiscal year, they can decide we're going to pay a lot less. And you states are still on the hook, because you — you say it's not an easy choice. We can ask whether it's coercion. You're not going to be able to bail out of Medicaid. You just have to pay more, because we're going to pay less. Well, like I said, I agree that it would be a difficult choice in some circumstances. But that is not to say it's coercion as a legal matter or even as a practical matter. And I think it would depend on what the circumstances were and how — and I think trying to think about how a court would ever answer the question of whether it was coercive, it was too difficult as a practical matter for states to withdraw. General, I'm trying to go back to that, because Justice Kennedy asked you whether there's — I think he said it's coercion if no one can be politically accountable. I'm not sure how that could be practically politically accountable, because almost every gift, if the terms are attractive, it would be an unattractive political alternative to turn it down. Dole itself was one of those cases. I think every state raised the drinking age to 21, correct? Yes, Justice Sotomayor. And this argument was raised in Dole, and the Court rejected it as a — Well, I guess my point is that political accountability has two components. What can I do if I like something, and what can I do if I don't like something? And if people really like something, like Medicaid, they're not going to let you drop it, correct? Well, the citizens of the state — Exactly. That's the whole point. That's their choice. And I think that's where I get back to the point. That's why I think this is — wrong to think about this as coercion, because this is a program that works effectively for the citizens of the state, and state governments think that, and that is why it has expanded the way it's expanded, because it's providing an essential service for millions of needy citizens in these states. It's providing access to health care that they would not otherwise have. You mentioned the Dole case. Now, what was the threat in that case? Raise your drinking age to 21 or what? Or lose a percentage of your highway funds. Remember the percentage? 7 percent, yes. It's a pretty small amount. That's really apples and oranges when you're talking about lose all of your Medicaid funds or lose — I thought it was 5, but 7 — 7 percent of your highway funds. I think — I agree with Your Honor that it's different, but I don't think that that makes this coercion as a legal matter. As I said, I think that this is a situation in which the — if the states — I'm not saying it would be an easy choice, but the states made the choice. They made the choice. Well, they made a choice with the stimulus bill, didn't they? Some governors rejected the stimulus bill. And some of their congressional or legislative processes overturned that. That's right. And others, they supported it. The percentages were smaller, but it's always the preference of the voters as to what they want. What was the threat in the stimulus bill? What would the state lose? That answer I don't know. Would anything be taken away, or would it just lose the opportunity to get the money? I don't know the answer to that. I don't know the answer to that. But if I may just say in conclusion that — I'd like to take half a step back here — that this provision, the Medicaid expansion that we're talking about this afternoon, and the provisions we talked about yesterday, we've been talking about them in terms of their effect as measures that solve problems, problems in the economic marketplace that have resulted in millions of people not having health care because they can't afford insurance. There is an important connection, a profound connection, between that problem and liberty. And I do think it's important that we not lose sight of that, that in this population of Medicaid-eligible people who will receive health care that they cannot now afford under this Medicaid expansion, there will be millions of people with chronic conditions like diabetes and heart disease. And as a result of the health care that they will get, they will be unshackled from the disabilities that those diseases put on them and have the opportunity to enjoy the blessings of liberty. And the same thing will be true for a husband whose wife was diagnosed with breast cancer and who won't face the prospect of being forced into bankruptcy to try to get care for his wife and face the risk of having to raise his children alone. And I could multiply example after example after example. In a very fundamental way, this Medicaid expansion, as well as the provisions we discussed yesterday, secure the blessings of liberty. And I think that it's important as the Court is considering these issues that that be kept in mind. Congress struggled with the issue of how to deal with this profound problem of 40 million people without health care for many years. And it made a judgment. And its judgment is one that is, I think, in conformity with what lots of experts thought was the best complex of options to handle this problem. Maybe they were right. Maybe they weren't. But this is something about which the people of the United States can deliberate and they vote. And if they think it needs to be changed, they can change it. And I would suggest to the Court, with profound respect for the Court's obligation to ensure that the federal government remains the government of enumerated powers, that this is not a case in any of its aspects that calls that into question. That this is a judgment of policy that democratically accountable branches of this government made by their best lights. And I would urge this Court to respect that judgment and ask that the Affordable Care Act in its entirety be upheld. Thank you. Thank you, General. Mr. Clement, you have five minutes. Thank you, Mr. Chief Justice, and may it please the Court, just a few points in rebuttal. First of all, we've talked a lot about the sort of hallmark of coercion, your money or your life, with somebody with a gun. I would respectfully suggest that it is equally coercive, certainly not uncoercive, if I say your money or your life. And by the way, I have discretion as to whether or not I will shoot the gun. I don't think that eliminates the coercion. I also don't think this is a discretion that the Secretary would ever be able to exercise. And the reason is, we disagree on the details, but the Solicitor General and I agree that over the years, Congress has had different approaches to expanding Medicare. Sometimes, as in 1972, it makes the expansion voluntary. That's also, by the way, what happened with the stimulus funds, which were voluntary funds. You didn't lose all your Medicaid funds, which is why 17 states could say no. Sometimes they take the voluntary approach. Sometimes, as in 1984, they take the mandatory approach. If the Secretary exercised the discretion to say, you know what, it really isn't reasonable for you to have to give up your funding for the visually impaired and the disabled just to cover these newly eligible people, so we'll make it voluntary, we'll make that discretionary, that would essentially be creating, converting a 1984 amendment approach to a 1972 amendment approach. And I just don't think that's the kind of discretion that the Secretary has, with all due respect. Now, moving on to the next point, Justice Alito, your hypothetical, I think, absolutely captures the effect on this, based on the fact that these tax dollars are being taken from the state's tax base. And it's not like Steward Machine, where the federal government would say, and oh, by the way, if you don't take the option we're giving you, we're going to have a federal substitute that will go in, and we'll take care of the unemployed in your state. Here, if you don't take this offer that we're giving you, your tax dollars will fund the other 49 states, and you'll get nothing. But, of course, this situation is much more coercive, even in your hypothetical, because it is tied directly to the mandate. It's also tied to the participation in the preexisting program. So it's as if there was yet another program for post-secondary education, they gave them exactly your option, and then they also said, oh, and by the way, you not only get not to get these funds, but you'll lose the post-secondary funds as well. It's really hard to understand tying the preexisting participation in the program as anything other than coercive. The Solicitor General makes a lot of the fact that there are optional benefits under this program. Well, guess what? After the Medicaid expansion, there will be a lot less opportunity for the states to exercise those options, because one of the things that the expansion does, precisely because the expansion is designed to convert Medicaid into a program that satisfies the requirement of the minimum essential coverage of the individual mandate, things that used to be voluntary will no longer be voluntary. The perfect example is prescription coverage. That's a big part of the benefits that some states, but not all, provide voluntarily now. It will no longer be voluntary after the expansion, because the federal government has deemed prescription drugs to be part of the minimal essential health coverage that everybody in this country must have under the mandate. So that option that the state has is being removed by the expansion itself. The Chief Justice makes the point — Mr. Clement, may I ask one question about your bottom line in this case? It sounds to me like everything you said would be to the effect of, if Congress continued to do things on a voluntary basis, so with getting these new eligibles, and say states, you can have it or not, you can preserve the program as it existed before, you can opt into this. But you're not asking the court as relief to say, well, that's how we cure the constitutional infirmity. We say this has to be on a voluntary basis. Instead, you are arguing that this whole Medicaid addition, the whole expansion has to be nullified, and moreover, the entire health care act. Instead of having the easy repair, you say that if we accept your position, everything falls. Well, Justice Ginsburg, if we can start with the common ground that there's a need for repair, because there is a coercion doctrine and this statute is coercion, then we're into the question of remedy. And we do think, we do take the position that you describe in the remedy, but we would be certainly happy if we got something here, and we got a recognition that the coercion doctrine exists, this is coercive, and we get the remedy that you suggest in the alternative. Let me just finish by saying that I certainly appreciate what the Solicitor General says, that when you support a policy, you think that the policy spreads the blessings of liberty. But I would respectfully suggest that it's a very funny conception of liberty that forces somebody to purchase an insurance policy whether they want it or not. And it's a very strange conception of federalism that says that we can simply give the states an offer that they can't refuse, and through the spending power, which is premised on the notion that Congress can do more because it's voluntary, we can force the states to do whatever we tell them to. That is a direct threat to our federalism. Thank you. Thank you, Mr. Clement. And thank you, General Verrilli, Mr. Kneedler, Mr. Carvin, Mr. Katsas, and in particular, of course, Mr. Long and Mr. Farr. The case is submitted.